UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MIRIAM LOVEMAN,

        Plaintiff,


      -against-                          06 Civ. 2802 (LAK)


LEONARD A. LAUDER, et al.,

        Defendants,

    -and-

THE ESTÉE LAUDER COMPANIES, INC.,

        Nominal Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


    Appearances:


           Robert I. Harwood
           Samuel K. Rosen
           WECHSLER HARWOOD LLP
           *Attorneys for Plaintiff*


           Jonathan D. Polkes
           Ashley R. Altschuler
           Joshua S. Amsel
           WEIL, GOTSHAL & MANGES LLP
           *Attorneys for Defendants and Nominal Defendant*

LEWIS A. KAPLAN, *District Judge.*

The Estée Lauder Companies Inc. ("ELC") saw its stock decline sharply in 2005 as Wall Street became disappointed with its financial performance. As has occurred with other companies in like circumstances, the ELC price decline led to class actions in which the plaintiffs claimed that the company had misled the investing public in order to prop up its stock, only to have the bad news eventually come out to the detriment of some investors.[1] Also as in other comparable circumstances, these events have led as well to this derivative action, in which a shareholder seeks to recover for ELC from its directors and management the corporate costs associated with such litigation, among other alleged damages. Defendants now pursue the well trodden path in such cases, moving to dismiss the complaint on the ground that plaintiff has not made, or sufficiently alleged facts excusing, a demand that the board cause the company to pursue the action in its own right.

*Facts*

I.      *The Alleged Wrongdoing*

The complaint, the allegations of which are taken as true for purposes of outlining the alleged wrongdoing, claims the following:

A.      *The Financial Releases and the Stock Decline*

On April 28, 2005, ELC issued a press release announcing earnings for the third fiscal quarter ending March 31, 2005 that were short of Wall Street analysts' expectations. The release

---

[1]     These are consolidated before me as *In re Estée Lauder Companies Securities Litigation,* Master Docket No. 06 Civ. 2505 (LAK).

3

attributed the shortfall to ELC's launch of new products and indicated that the company expected

to make up the shortfall in the fourth quarter. In addition, it lowered slightly the company's full year

guidance.[2] In a conference call with analysts, chief financial officer Richard Kunes said that

inventory growth was attributable to slower than expected sales and dismissed speculation that the

then imminent consolidation of two major customers, Federated Department Stores, Inc. and May

Department Stores, Inc., would impact 2006 sales negatively.[3]

On August 16, 2005,[4] ELC announced its results for the fourth fiscal quarter and the

full fiscal year 2005. These were consistent with prior guidance, and the release indicated that the

company expected diluted earnings per share for the first half and full fiscal year 2006 to "be

essentially flat" with sales increasing between 5.5 and 6.5 percent.[5] In a conference call with analysts

that day, William Lauder said that the impact of the Federated-May merger would be positive for

ELC.[6] ELC stock rose sharply the next day.[7]

About a month later, on September 19, 2005, ELC revised downward its guidance

---

[2]

    Cpt. ¶ 35.

[3]

    *Id.* ¶¶ 36-38.

[4]

    The complaint says August 16, 2006. It is clear from the context, however, that this is a typographical error and that the intended date is one year earlier.

[5]

    *Id.* ¶ 42.

[6]

    *Id.* ¶ 43.

[7]

    *Id.* ¶ 44.

4

for the first half of 2006, although it reaffirmed its previously-announced outlook for the full year.[8] The stock, however, declined from $40.48 on September 19 to $35.98 on September 21, 2005,[9]

Following the September 19, 2005 announcement, a number of analysts turned somewhat negative on ELC. Deutsche Bank issued a report that characterized the company's announcement as unexpected and noted that Lancôme, an ELC competitor, had not experienced similar problems. It expressed skepticism about ELC's fiscal 2006 guidance. Subsequent reports by Deutsche Bank and Citibank expressed concern that the earlier results had been inflated by channel stuffing (i.e., placing excess product in the hands of retailers).[10]

On October 26, 2005, ELC announced results for the first quarter of fiscal 2006 that were well below Wall Street expectations, including a decline of as much as 33 percent in profits and significantly lower guidance for the full year. The stock dropped following this news, falling almost 8 percent that day.[11] The Court notes, however, that it has risen more or less steadily since then, to a price now around $50 per share.

---

[8]    *Id.* ¶ 46.

[9]    *Id.* ¶ 47.

It is noted, parenthetically, that the stock now is about $50 per share.

[10]    *Id.* ¶¶ 48-50.

[11]    *Id.* ¶¶ 51-52.

5

B.      *The Alleged Insider Sales*

During this period, the complaint alleges, a few ELC insiders sold company stock.

The most significant transaction was announced on May 24, 2005, when the company disclosed that it had agreed to purchase 1.872 million shares of Class A Common Stock from Ronald Lauder at $39.25 per share, an aggregate price of $74.47 million. This transaction allegedly was approved by the entire ELC board.[12] The complaint alleges, however, that the company had not then announced to the general public a number of allegedly negative circumstances including principally these:

- Approximately one-third of ELC's business was driven by "gift with purchase" promotions and that ELC had been unable to analyze the effectiveness of these promotions for specific ELC brands, leaving it hampered in its ability to cut marketing costs.

- The number of customers purchasing ELC products through the traditional department stores in which those products were sold was declining sharply and thus having a material adverse effect on ELC's sales and earnings performance and prospects.

- ELC concealed its shortfall in sales and earnings by offering its products to retailers on exceptionally favorable terms. This in turn placed excess product

---

[12]

*Id.* ¶ 40.

ELC has submitted evidence that the transaction in fact was approved by seven outside directors with the insiders abstaining. Polkes Rep. Decl. Ex A (ELC News Release, dated May 24, 2005).

in the company's retail channel that would cut into ELC's 2006 sales.[13]

Ronald Lauder sold an additional 105,000 shares during the period May 24 through September 15, 2005. Other family members also sold shares during this period as follows:

- A trust for the benefit of Aerin Lauder and others sold 35,000 shares for over $1.4 million on August 24, 2005.

- Chief operating officer Daniel J. Brestle sold 133,332 shares for over $5.5 million on August 19, 2005.

- Executive vice president Malcolm Bond sold 82,932 shares on August 23, 2005 for over $3.3 million.[14]

II. *The Claims Asserted in the Complaint*

The complaint alleges three claims for relief. It is important to focus upon them in view of the considerable disparities between the pleading and the accounts of the pleading in the parties' memoranda.

Count I is brought against all of the directors and a number of ELC officers for breach of the duty of loyalty and good faith in connection with the management of the business. Specifically, it alleges that all of the individual defendants conspired to (1) issue false press releases to inflate the price of ELC stock, thus enabling ELC insiders to sell shares at artificially inflated prices, (2) maintain their positions at ELC, and (3) deceive the investing public regarding the

---

[13]

Cpt. ¶ 41.

[14]

*Id.* ¶ 53.

company's financial health, stability, and prospects.[15] Putting to one side the entirely conclusory allegation of conspiracy, the principal allegations are to the effect that the defendants "made no meaningful effort to oversee ELC's operations and business practices to ensure that the Company complied with all applicable laws, rules, and regulations" and "abdicated their fiduciary duties of loyalty and good faith."[16] With the exception of the allegation of board approval of the stock purchase from Ronald Lauder, the complaint does not allege any specific business decision made or approved by the board of directors.

Count II, also brought against the directors and several ELC officers, seeks contribution or indemnification of ELC for the company's liability, if any, in the securities fraud class actions. It also, rather confusingly, alleges that the defendants are liable for waste "by approving the repurchase of R. Lauder's personally-held Company stock, and paying incentive based bonuses."[17]

Finally, Count III asserts claims for insider selling and misappropriation of information against defendants Ronald and Aerin Lauder and Brestle in connection with their stock sales.[18]

---

[15]    *Id.* ¶¶ 60-63, 26-30.

[16]    *Id.* ¶ 62.

[17]    *Id.* ¶¶ 64-67.

This allegation is confusing because it is difficult to see how a claim for waste by virtue of the stock repurchase comes under the heading of contribution and indemnification.

[18]    *Id.* ¶¶ 70-74.

III.     *Facts Pertaining to the Lack of a Demand*

Members of the Lauder family control over 82 percent of ELC's voting shares. Under a stockholders' agreement, they are obliged to vote all of their beneficially owned shares for Leonard and Ronald Lauder and for one person designated by each for director.[19]

The board, according to the complaint, consists of twelve directors. Four are Lauder family members and inside directors.[20] One – Richard D. Parsons, who is chairman of the board and chief executive officer of Time Warner, Inc.[21] – is a trustee of trusts benefitting Aerin Lauder and others.[22] The other seven – former U.S. Trade Representative Charlene Barshefsky, Marshall Rose, Rose Marie Bravo, Mellody Hobson, Irvine O. Hockaday, Barry S. Sternlicht, and Lyn Forester de Rothschild – are outside directors.[23]

Putting aside the usual conclusory and, in itself insufficient, allegation that all of the directors, all of whom are defendants, were parties to a conspiracy to commit the alleged wrongdoing,[24] the operative factual allegations relevant to whether demand on the board is excused

[19]
    *Id.* ¶ 33.

[20]
    *Id.* ¶¶ 6-9.

[21]
    *Id.* ¶ 59g(2).

[22]
    *Id.* ¶ 19.

[23]
    *Id.* ¶¶ 13-18, 20.

[24]
    In view of the requirement of particularized allegations to excuse a failure to make a demand, the conclusory allegation of conspiracy properly may be disregarded. *See Greenfield v. Tele-Commc'ns*, No. Civ. A. 9814, 1989 WL 48738, *3 (Del. Ch. May 10, 1989) ("Even in an era of notice pleading, conclusory allegations of conspiracy have regularly been rejected." (citing *Leeward Petroleum, Ltd. v. Mene Grande Oil Co.*, 415 F.

include principally the following:

- The Compensation Committee of the board controls the compensation and emoluments of the directors. It consisted during the relevant period of Leonard Lauder, Parsons, Bravo and de Rothschild. It is said to be "dominated by the Lauder Family Defendants or persons beholden to them."[25]

- The Nominating Committee of the board recommends nominees for the board and reviews board compensation. Outside directors receive $70,000 annual cash retainers, an additional $25,000 via grants of stock units, and annual grants of options with 10 year terms to purchase 5,000 shares of ELC Class A Common Stock. It consisted during the relevant period of Leonard Lauder, Parsons, Barshefsky and de Rothschild. It is said to be "dominated by the Lauder Family Defendants or persons beholden to them."[26]

- The Audit Committee – which consisted of Hockaday, Hobson, and Sternlicht – allegedly recommended that the board "include the Forms 10-Q and 10-K, and false and misleading press releases." They allegedly caused or allowed improper financials.[27]

- ELC in fiscal 2005 placed over $12.3 million in advertising in Time Warner

---

Supp. 158 (D. Del. 1976)).

[25] *Id.* ¶ 59d.

[26] *Id.* ¶ 59e.

[27] *Id.* ¶ 59f.

publications.[28]

- Barshefsky is a partner in Wilmer Cutler Pickering Hale and Dorr LLP, a law firm that provided legal services to ELC in 2005 and 2006.[29]

- In 2005, ELC employees used properties of Starwood Hotels & Resorts, Worldwide Inc. ("Starwood"), of which Sternlicht is chairman and chief executive officer, and paid aggregate fees of about $2.5 million.[30]

*Discussion*

I.   *The Applicable Standard*

It is too well settled to require citation of authority that the management of corporations is entrusted to their boards of directors and that it ordinarily is up to the board to determine whether to cause a corporation to pursue a claim, whether against a stranger to the company or a director or member of management. In consequence, shareholders typically are foreclosed from suing on behalf of a corporation on a claim that the corporation itself has not brought. The exception is that a shareholder may sue derivatively on behalf of a company if the shareholder (1) makes a demand that the board cause the company to pursue the claim and sufficiently alleges that "the board wrongfully refused the plaintiff's pre-suit demand to initiate the

---

[28]
     *Id.* ¶ 59g(2).

[29]
     *Id.* ¶ 59g(3).

[30]
     *Id.* ¶ 59g(4).

suit" or (2) sufficiently alleges that "a demand would be a futile gesture and is therefore excused."[31]

In this case, plaintiff made no pre-suit demand, but alleges that demand is excused because, in her view, it would be futile. As ELC is a Delaware corporation, the parties agree that the sufficiency of the complaint with respect to demand futility is governed by the law of that state.[32]

Delaware requires that facts demonstrating that a demand would be futile be alleged with particularity.[33] This "differ[s] substantially from the permissive notice pleadings" permitted with respect to other matters.[34] Hence, "[c]onclusory 'allegations of fact or law [which are] not supported by allegations of specific fact may not be taken as true.'"[35]

As "derivative suits challenge the propriety of decisions made by directors pursuant to their managerial authority, . . . stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue [a] derivative claim."[36] Hence, as the Delaware Supreme Court held in *Aronson v. Lewis*,[37] "[d]emand is excused if a derivative

---

[31]

     *White v. Panic*, 783 A.2d 543, 550 (Del. 2001).

[32]

     *E.g.*, *In re Veeco Instruments, Inc. Secs. Litig.*, 434 F. Supp. 2d 267, 273 (S.D.N.Y. 2006) (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991)).

[33]

     Del. Ch. R. 23.1; *accord* Fed. R. Civ. P. 23.1.

[34]

     *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

[35]

     *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)), *overruled on other grounds*, *Brehm*, 746 A.2d 244 (clarifying appellate review standard in Rule 23.1 cases).

[36]

     *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993).

[37]

     473 A.2d 805 (Del. 1984), *overruled on other grounds*, *Brehm*, 746 A.2d 244.

complaint pleads particularized facts creating reasonable doubt that '(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'"[38] "The essential predicate for the *Aronson* test[, however,] is the fact that a *decision* of the board of directors is being challenged in the derivative suit."[39] "[W]here the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit[,]" a plaintiff must make "particularized factual allegations [that] . . . create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[40] Accordingly, the standard for pleading "lack of good faith as evidenced by a sustained systematic failure of a director to exercise reasonable oversight" – a situation in which the suit by definition does not challenge a decision of the board – is "quite high" and "demanding."[41] Thus, it makes a great deal of difference under Delaware law whether a derivative suit challenges a business decision of the board or merely alleges inaction or inattention. And it is this distinction that has led each side in this case to don blinders, seeing only the part of the complaint that says *only* that which is more favorable to its prospects on this motion.

   Plaintiff asserts that the gravamen of this case is corporate waste – the board allegedly approved the purchase of Mr. Lauder's shares at a price that he otherwise could not have obtained

---

[38] *Id.* at 814.

[39] *Rales*, 634 A.2d at 933 (emphasis in original).

[40] *Id.* 933-34.

[41] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996).

13

and thus needlessly squandered corporate assets for no benefit. Plaintiff therefore ignores entirely the fact that Count I of the complaint alleges principally director inattention or ineptitude, that Count II alleges principally a claim for contribution and indemnity under the securities laws, and that Count III is brought only against a handful of the defendants for their alleged insider trading on the basis of information that belonged to the company. In other words, she ignores entirely the fact that the bulk of the complaint alleges precisely the type of director *in*action that triggers the more exacting *Rales-Caremark* standard. Indeed, plaintiff's allegation that the stock purchase constituted waste is made only fleetingly in the midst of a complaint that focuses predominantly on other matters.[42] The reason for this *post hoc* attempt to rewrite the complaint is quite obvious. Plaintiff virtually concedes that she has not met the *Rales-Caremark* standard.[43]

Plaintiff is not alone in this head-in-the-sand approach. Just as she ignores her own allegations of director inaction, defendants ignore the allegation of waste in the board's approval of the Lauder stock purchase. Their opening brief blithely and inaccurately asserts that "specific board action is not at issue."[44] Other such statements abound.

Quite plainly, then, this complaint challenges both a specific business decision allegedly made by the board – the stock purchase – and *Caremark*-type allegations of inaction and

---

[42]

The stock purchase is referred to in only four of the 74 paragraphs of the complaint. Cpt. ¶¶ 40, 41, 53a, 67.

[43]

She admits that "liability might be difficult to establish" under *Caremark,* but argues that *Caremark* does not apply because "this action is not founded on directorial oversight, it is based on directorial waste, conduct far removed from *Caremark*'s 'demanding' standard." Pl. Mem. 18. Elsewhere she acknowledges that "defendants' motion might have merit" if plaintiff relied solely on "*Caremark*-like allegations." *Id.* at 7.

[44]

Def. Mem. 13.

14

failure adequately to oversee the corporation's activities. Each should be analyzed under the appropriate standard.

## II. The Stock Purchase

Plaintiff contends that she has satisfied both prongs of the *Aronson* standard with respect to the stock purchase.

### A. Self Interest and Lack of Independence

The first prong, as noted, requires particularized factual allegations raising a reasonable doubt that directors are disinterested and independent. Moreover, any disabling self-interest or lack of independence must afflict a majority of the corporation's directors.[45] Plaintiff's entire argument on this point, however, is merely this:

> "The approval by the entire board of the stock purchase creates a reasonable doubt of a lack of directorial independence and disinterestedness because the transaction only benefitted Lauder and was to the detriment of ELC. The Complaint does not merely contain the 'shorthand shibboleth of "dominated and controlled" directors . . . .' *Aronson*, 473 A.2d at 816. It sets forth in detail the date, price, amount, and method of approval of the wasteful corporate purchase. In short, it alleges the harm caused by, and the result of, the lack of independence. But then the Complaint goes even further. As set forth in Point IV below, it alleges background reasons creating the lack of independence that mandate board sterilization. Such

---

[45]

See, e.g., *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004) ("If the Court determines that the pleaded facts create a reasonable doubt that a majority of the board could have acted independently in responding to the demand, the presumption [that directors are faithful to their fiduciary duties] is rebutted for pleading purposes and demand will be excused as futile."); *Brehm*, 746 A.2d at 257 ("[I]ssues of disinterestedness and independence involved in the first prong of *Aronson* are whether a majority of the [board] . . . was disinterested and independent.").

background heightens the reasonable doubt of board disinterest and independence."[46]

The claim that director interest and dependence follows "because the transaction only benefitted Lauder and was to the detriment of ELC" is utterly speculative. The only allegation that even bears on this contention is the assertion in plaintiff's memorandum of law that the stock was sold at the NYSE market price despite the fact that the number of shares in the block was more than twice the trading volume in ELC on the exchange *that day*[47] – from which plaintiff draws the conclusions that Mr. Lauder could not otherwise have obtained that high a price and that the company necessarily overpaid. Even putting aside the fact that these contentions do not appear in the complaint,[48] they are simply lawyers' arguments rather than particularized facts. It certainly does

---

[46]    Pl. Mem. 14.

[47]    *Id.* at 5.

[48]    Plaintiff asserts that the Court may take judicial notice of matters of public record, including "documents required to be filed with the Securities and Exchange Commission." *Id.* at 5 n.7. The Court agrees that it may take judicial notice of the closing price and volume of trading of ELC shares on the date in question. It would be entirely inappropriate, however, to take judicial notice of the exceptionally dubious conclusions that plaintiff would draw from those facts. And while a court passing on a motion to dismiss in some instances may take judicial notice of statements made in documents outside the complaint for the purpose of establishing that the documents contain those statements, it may not properly do so to establish the truth of the matters asserted.

This folly of plaintiff's judicial notice contention is well illustrated by the complaint's assertion that the stock purchase was approved by "the entire board." Cpt ¶ 40. Defendants point out that the press release by which ELC announced that transaction states that "[t]he purchase . . . was approved by the Company's [seven] independent directors." Polkes Reply Decl. Ex. A. As this press release is relied upon in (but not attached to) the complaint, its text is properly considered on this motion. *E.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). But if plaintiff were right in suggesting that the Court may take judicial notice of anything contained in a document that is a matter of public record, it would be appropriate to take judicial notice of the truth of the press release and the falsity of this allegation of the complaint. The Court declines to do so.

not follow that large blocks of stock necessarily command lower prices than shares traded in normal exchange trading; that may or may not be so, depending upon other circumstances. Nor does it follow that the board could not reasonably have concluded that the company's prospects were such that the purchase was advantageous to ELC. In short, plaintiff's assertion that the purchase was detrimental to the company, and the implication that it obviously was so highly detrimental as to evidence a lack of directorial independence, is spun out of whole cloth. And while the Court does not rely on the point, it is more than passing interest that the stock ELC bought for $39.95 now is trading at over $50.

Plaintiff's next argument is even less persuasive. The fact that she has alleged "the date, price, amount, and method of approval" of the transaction is entirely irrelevant. Those facts bear no logical connection to the independence, or lack thereof, of the directors. In consequence, satisfaction of *Aronson*'s first prong, if it has been satisfied, must be found in the "background reasons" "set forth in Point IV" of plaintiff's memorandum – alleged family and business relationships among board members coupled with alleged "failure to disclose and/or learn of corporate misconduct."[49]

Ronald Lauder, who stood on the other side of the stock purchase, obviously is self-interested and could not properly respond to a demand. The Court assumes, but does not decide, that the same would be true of the other three Lauder family members and of Mr. Parsons, who is a trustee of trusts for the benefit of, among others, one of the Lauder family directors. That leaves seven other directors, Mss. Barshefsky, Bravo, Hobson, and de Rothschild and Messrs. Rose,

---

[49]       Pl. Mem. 18.

Hockaday, and Sternlicht – a majority of the board.

Plaintiff first attacks their independence by pointing to what her memorandum rather vaguely refers to as financial and business relationships, citing (insofar as is relevant in light of the Court's assumption with respect to the Lauder family directors and Mr. Parsons) only paragraphs 59g(3)-(4) of the complaint. But these allege only that Ms. Barshefsky is a partner in Wilmer Cutler Pickering Hale and Door [*sic*] LLP, a firm that provided legal services to ELC in 2005 and 2006, and that ELC employees incurred about $2.5 million in charges at properties of Starwood, a company of which Mr. Sternlicht was chief executive officer until May 2005.[50] These allegations fall far short.

As an initial matter, Mr. Sternlicht's tenure as chief executive officer of Starwood ended before this action was commenced. Hence, even if ELC's expenditure of $2.5 million over two years with a large company of which Mr. Sternlicht still was chief executive officer otherwise would have rendered him an interested director, the fact is that there no longer was any such self-interest by the time the complaint was filed. Plaintiff has not alleged facts suggesting that Mr. Sternlicht would have had any self interest in responding to a demand on the board.

More broadly, the allegations that Ms. Barshefsky and Mr. Sternlicht are or were connected with firms that have done business with ELC in the past, at least in the circumstances of this case, are insufficient. "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[51] But there is no allegation here that either Ms. Barshefsky or Mr. Sternlicht stood to receive any personal financial

---

[50]     Cpt ¶¶ 59g(3)-(4).

[51]     *Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 812).

benefit either from the ELC-Lauder stock purchase or from the business done by ELC with the firms with which they are or were connected, much less that any benefit they might have stood to receive from the latter was material. Plaintiff has failed sufficiently to allege self interest of either of them. Accordingly, a majority of the board is presumed to be disinterested.

Plaintiff's allegations of dependence of board members on the Lauder family are the usual *pastiche* of alleged nonfeasance as proof of dependence, receipt of directors' fees, and the like, served up with the *soupçon* that ELC, by virtue of the Lauder family's ownership of a majority of the voting stock, is a "controlled company" under NYSE rules. None of this, however, sustains plaintiff's burden.

The fact that the Lauder family has voting control of ELC, without more, does not overcome the presumption of director independence. As the Delaware Supreme Court recently held:

> "A controlling interest or majority stock ownership does not deprive the corporation's directors of the 'presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person [or entity].'"[52]

The allegations that the outside directors receive fees from ELC and that they presumably could not have been elected to the board without at least the acquiescence and probably support of the Lauders do not bridge the gap. Certainly the receipt of "ordinary director compensation alone is not enough to show demand futility."[53] Likewise, "it is not enough to charge

---

[52]
    *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 512 (Del. 2005) (quoting *Aronson*, 473 A.2d at 815) (alteration in original).

[53]
    *A. R. DeMarco Enters., Inc. v. Ocean Spray Cranberries Inc.*, No. Civ. A. 19133-NC, 2002 WL 31820970, at *5 (Del. Ch. Dec. 4, 2002); *accord, e.g.*, *Langner v. Brown*, 913 F. Supp.

19

that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence."[54]

To be sure, particularized allegations that a director yielded to the wishes of a controlling shareholder, as opposed to exercising his or her independent business judgment, would rebut the presumption of independence.[55] But, as *Aronson* makes clear, the fact that a director approves a transaction that benefits a controlling shareholder is not sufficient. Rather, the plaintiff must allege specific facts showing that the director failed to bring "his or her own informed business judgment to bear with specificity upon the corporate merits of the issues without regard for or succumbing to influences which convert an otherwise valid business decision into a faithless act."[56] This she has not done.

Accordingly, plaintiff has failed to satisfy *Aronson*'s first prong with respect to the stock purchase. She does not allege particularized facts raising a reasonable doubt as to the disinterestedness and independence of a majority of ELC's board.

---

260, 266 (S.D.N.Y. 1996); *Grobow*, 539 A.2d at 188, *overruled on other grounds*, *Brehm*, 746 A.2d 244; *Orman v.Cullman*, 794 A.2d 5, 29 & n.62 (Del. Ch. 2002).

[54] *Aronson*, 473 A.2d at 816.

[55] *Id.*

[56] *Id.*

B.     *The Business Judgment Rule*

*Aronson*'s second prong requires the allegation of particularized facts raising a reasonable doubt that the stock purchase was the product of a valid exercise of business judgment.

Plaintiff makes a bow in that direction. She argues, for example, that the stock purchase was disadvantageous to the company and that ELC's Form 8-K with respect to the transaction made no reference to the board having obtained an independent appraisal of the stock or of having bargained for a lower price. As shown above, however, there is no basis in the record for the assertion that the transaction was detrimental to ELC. Plaintiff has substituted her attorneys' unsupported speculation for particularized facts. The Form 8-K upon which she relies is not in the complaint. But even if it were, it would not matter. It is plaintiff's burden to allege particularized facts raising a reasonable doubt that the stock purchase was a valid exercise of business judgment, not – at least in the context of evaluating a derivative plaintiff's failure to make a pre-suit demand – defendants' burden to file a Form 8-K that details the steps taken by the board in determining whether to approve the transaction.[57] Accordingly, plaintiff has not satisfied *Aronson*'s second prong

---

[57]     When a company enters into a "material definitive agreement" not in the ordinary course of business, it is required to disclose on a Form 8-K principally (1) the date of the agreement, (2) the identity of the parties, and (3) a brief description of the terms and conditions that are material to the company. *See* Form 8-K § 1.01, *available at* http://www.sec.gov/about/forms/form8-k.pdf (last visited May 1, 2007). When a company acquires a "significant amount of assets," it must disclose principally (1) the date of the transaction, (2) a brief description of the assets involved, (3) the identity of the person from whom the assets were acquired and any material relationship to that person, and (4) the amount of consideration given and, if there were any material relationship to the person from whom the assets were acquired, the formula or principle followed in determining the amount of consideration. *See id* § 2.01.

Assuming *arguendo* that ELC's acquisition of Ronald Lauder's shares was a material definitive agreement or an acquisition of a significant amount of assets for Form 8-K purposes, ELC was not required either by § 1.01 or § 2.01 of Form 8-K to disclose the steps

either.


III.    *Board Inaction*

        The balance, and predominant part, of the complaint alleges principally that the board failed to prevent the issuance of false press releases and "made no meaningful effort to oversee ELC's operations and business practices to ensure that the Company complied with all applicable laws, rules, and regulations."[58] The question is whether plaintiff has met the "quite high" and "demanding" requirement[59] of "particularized factual allegations [that] . . . create a reasonable doubt that, as of the time the complaint is filed, the board of directors could [not] have properly exercised its independent and disinterested business judgment in responding to a demand."[60] Inasmuch as plaintiff has briefed this motion on the premise that she challenges only specific board action, and therefore that *Aronson* supplies the only relevant standard, she has not seriously addressed this issue.

        We begin with the fact, indicated above, that the Lauder family's control of a majority of ELC's voting shares and the company's concomitant status under NYSE rules as a "controlled company" do not rebut the presumption that the outside directors were able to exercise indpendent and disinterested business judgment in responding to a demand. Nor, for reasons already discussed,

---

taken by the board in determining whether to approve the transaction. Accordingly, its failure to do so would not raise an inference that the board did not exercise sound business judgment in approving the repurchase of Mr. Lauder's shares, even assuming that plaintiff had incorporated the Form 8-K in the complaint.

[58]

        Cpt ¶¶ 62-63.

[59]

        *Caremark*, 698 A.2d at 971.

[60]

        *Rales*, 634 A.2d at 934.

22

do the modest business relations between the Wilmer and Starwood firms and ELC. Hence, the only point that requires any further discussion is the fact that the directors here are sued for contribution and indemnity with respect to ELC's cost of defending and liability, if any, in the class action.

Were the outside directors defendants in the class action and presented with a demand that they seek contribution or indemnification from themselves, they might well be regarded as self-interested and unable to pass appropriately on the demand. But the consolidated amended class action complaint names none of them as a defendant.[61] Accordingly, the Court sees no reason why a majority of the board could not exercise independent business judgment with respect to a demand.

*Conclusion*

The Court has considered all of plaintiff's arguments and concluded that she has failed to allege particularized facts sufficient to excuse her failure to demand that the board cause ELC to pursue these claims. Accordingly, the defendants' motion to dismiss the complaint [docket item 20] is granted.

SO ORDERED.

Dated:      May 2, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[61]      *In re Estée Lauder Companies, Inc. Secs.. Litig.*, 06 Civ. 2505 (LAK), Consol. Am. Cpt. (docket item 10).

23